FILED
United States Court of Appeals
Tenth Circuit

March 11, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ESTATE OF MARVIN L. BOOKER;
ROXEY A. WALTON, as Personal
Representative,

      Plaintiffs - Appellees,

v.

FAUN GOMEZ, individually and in her
official capacity; JAMES GRIMES,
individually and in his official capacity;
KYLE SHARP, individually and in his
official capacity; KENNETH ROBINETTE,
individually and in his official capacity;
CARRIE RODRIGUEZ, individually and in
her official capacity,

      Defendants - Appellants,

and

CITY AND COUNTY OF DENVER;
DENVER HEALTH AND HOSPITAL
AUTHORITY, d/b/a Denver Health Medical
Center; GAIL GEORGE, R.N., individually
and in her official capacity; SUSAN CRYER,
R.N., individually and in her official capacity,

      Defendants.

No. 12-1496

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:11-CV-00645-RBJ-KMT)**

Thomas S. Rice (Eric M. Ziporin, with him on the briefs), Senter Goldfarb & Rice, L.L.C., Denver, Colorado, appearing for Appellants.

Darold W. Killmer (Mari Newman and Lauren L. Fontana, with him on the brief), Killmer, Lane & Newman, LLP, Denver, Colorado, appearing for Appellees.

Before **KELLY, LUCERO,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

Denver police arrested Marvin Booker on a warrant for failure to appear at a hearing regarding a drug charge.  During booking, Mr. Booker died while in custody after officers restrained him in response to his alleged insubordination.  Several officers pinned Mr. Booker face-down to the ground, one placed him in a chokehold, and another tased him.  After the officers sought medical help for Mr. Booker, he could not be revived.

Mr. Booker's estate sued Deputies Faun Gomez, James Grimes, Kyle Sharp, Kenneth Robinette, and Sergeant Carrie Rodriguez (collectively "Defendants") under 42 U.S.C. § 1983, alleging they used excessive force against Mr. Booker and failed to provide him with immediate medical care, which resulted in Mr. Booker's untimely death.  The Defendants moved for summary judgment on qualified immunity grounds.  The district court denied their motion because disputed facts precluded summary judgment.  The Defendants now appeal.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

-2-

## I. LEGAL BACKGROUND

We begin by defining the scope of our jurisdiction over the Defendants' interlocutory appeal of the district court's denial of qualified immunity. We then summarize the legal framework for evaluating the Defendants' assertion of qualified immunity at the summary judgment stage.

### A. *Jurisdiction*

This court has jurisdiction under § 1291 to review "all final decisions of the district courts of the United States." 28 U.S.C. § 1291. Ordinarily, "[o]rders denying summary judgment are . . . not appealable final orders for purposes of 28 U.S.C. § 1291." *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013). "The denial of qualified immunity to a public official, however, is immediately appealable under the collateral order doctrine to the extent it involves abstract issues of law." *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013); *see also Fogarty v. Gallegos*, 523 F.3d 1147, 1153 (10th Cir. 2008) (we have interlocutory jurisdiction "over denials of qualified immunity at the summary judgment stage to the extent they 'turn[] on an issue of law.'" (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985))).

Under this limited jurisdiction, we may review: "'(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation.'" *Roosevelt-Hennix*, 717 F.3d at 753 (quoting *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1267 (10th Cir. 2013)). Under the Supreme Court's direction in *Johnson v. Jones*,

515 U.S. 304 (1995), however, this court has no interlocutory jurisdiction to review "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 320 (quotations omitted). Thus, "if a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law." *Roosevelt-Hennix*, 717 F.3d at 753 (quoting *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010)).

A key exception to *Johnson*'s jurisdictional rule arises if a district court fails to specify which factual disputes precluded a grant of summary judgment for qualified immunity. When faced with this circumstance, we are unable "to separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')." *Id.* (quoting *Johnson*, 515 U.S. at 319). Accordingly, before we can review abstract legal questions, we "may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Johnson*, 515 U.S. at 319; *see also Roosevelt-Hennix*, 717 F.3d at 754, 756 n.8.

This is one such "cumbersome review" case. Although the district court denied summary judgment on four claims because they "turn[ed] on issues of fact," it did not explicitly identify which material facts were in dispute. *See* Appx. at 1064. We must therefore comb "the record to determine what facts the district court, in the light most

-4-

favorable to [the Plaintiffs], likely assumed." *Roosevelt-Hennix*, 717 F.3d at 754.

Making our review less cumbersome is the district court's observation that the

"Plaintiffs' Statement of Disputed Facts" (ECF No. 133) outlined the primary factual

disputes that formed, at least in part, the basis of its decision. *See* Appx. at 1064

(observing that the "fact disputes" are "set forth in some summary at CM-ECF docket no.

133, but they're everywhere in this case"). That document lays out Plaintiffs' alleged

fact disputes, and we therefore assume the district court agreed they were material and

disputed.[1]

Also helpful are the various video clips of the encounter. Because the district

court failed to "identify the particular charged conduct that it deemed adequately

supported by the record," we must "look behind the order denying summary judgment

and review the *entire* record," including the video evidence submitted by the Defendants

in support of their motion for summary judgment. *Roosevelt-Hennix*, 717 F.3d at 756 n.8

(quotations omitted) (emphasis added).[2]

---

[1] "[W]e take this opportunity to urge district courts to heed *Johnson*'s admonition to state the facts the court is assuming for purposes of resolving a summary-judgment based request for qualified immunity. Such a consistent course of action preserves the district court's institutional advantage, at this interlocutory stage, in determining the existence, or nonexistence, of a triable issue of fact." *Roosevelt-Hennix*, 717 F.3d at 759 (citations and quotations omitted).

[2] We are mindful of another exception to *Johnson*'s jurisdictional rule—when the record "blatantly contradict[s]" the plaintiff's version of events. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (reversing denial of qualified immunity based on disputed facts where video evidence of car chase blatantly contradicted plaintiff's account of events).

Continued . . .

-5-

B. *Section 1983 and Qualified Immunity*

Title "42 U.S.C. § 1983 allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law." *Cillo v. City of Greenwood Village*, 739 F.3d 451, 459 (10th Cir. 2013). "Individual defendants named in a § 1983 action may raise a defense of qualified immunity," *id.*, which "shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law," *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quotations omitted). Generally, "when a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Cillo*, 739 F.3d at 460; *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

To determine whether the right was clearly established, we ask whether "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotations omitted). "Ordinarily, in order for the law to be clearly

_____
Cont.

But because the district court failed to identify the specific factual disputes that precluded summary judgment and we must therefore review the entire record to determine which facts the district court "likely assumed," *Roosevelt-Hennix*, 717 F.3d at 754, there is "no need . . . to resort to the blatantly-contradicted-by-the-record exception to the jurisdictional rule set out in *Johnson*," *id.* at 756 n.8. We therefore consider the video evidence along with any other evidence before the district court.

established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (quotations omitted). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful . . . to establish an absence of qualified immunity." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (quotations omitted).

## C. *Summary Judgment Standard*

Basic principles guide our review of the denial of summary judgment in this factually contentious case. "We review *de novo* the district court's denial of a summary judgment motion asserting qualified immunity." *McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010) (quoting *Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009)). A district "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In applying this standard, we construe the evidence in the light most favorable to [the Plaintiffs] as the nonmoving party." *McBeth*, 598 F.3d at 715.

When the defendant has moved for summary judgment based on qualified immunity, we still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor. *See id.* Unlike most affirmative defenses, however, the plaintiff would bear the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established

federal law. Thus, at summary judgment, we must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) (asking whether "a violation could be made out on a favorable view of the parties' submissions"), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) ("[T]he Supreme Court has held that qualified immunity is proper when the record plainly demonstrates no constitutional right has been violated, or that the allegations do not offend clearly established law.").

"We may, at our discretion, consider the two parts of this test in the sequence we deem best 'in light of the circumstances in the particular case at hand.'" *Bowling*, 584 F.3d at 964 (quoting *Pearson*, 555 U.S. at 223). If a "plaintiff successfully carries his two-part burden," the "defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996); *see also Pueblo Neighborhood Health Cntrs., Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988) (same).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual Background*

We recite the facts the district court "likely assumed" in the light most favorable to the Plaintiffs, drawing all reasonable inferences in their favor. The following is based on

the parties' statements of undisputed facts, the video evidence, and the Plaintiffs' Statement of Disputed Facts (ECF No. 133), which the district court relied upon in denying summary judgment.

## 1. Initial encounter with Mr. Booker

On the evening of July 8, 2010, Mr. Booker was arrested on a warrant for failure to appear at a court hearing related to a drug charge. Police transported him to the Downtown Detention Center ("DDC") to be booked. The DDC has an intake area called a "cooperative seating area" where arrestees wait to complete the booking process. According to the Defendants, uncooperative arrestees are moved into nearby intake/isolation cells until they calm down.

Around 3:30 a.m. on July 9, Deputy Faun Gomez called for Mr. Booker to approach the booking desk. Mr. Booker did so. Mr. Booker's precise behavior at this point is disputed,[3] but Deputy Gomez determined that Mr. Booker should be moved from the cooperative seating area to cell I-8, an intake/isolation cell. Deputy Gomez approached cell I-8 and ordered Mr. Booker to enter it. He walked toward her, but then

---

[3] It is disputed whether Mr. Booker yelled profanities at Deputy Gomez, whether he became uncooperative, and whether he disobeyed her orders to sit down. Because the Plaintiffs contest this fact and the video recording lacks audio, *see* Appx. at 361, we must resolve the dispute in their favor.

turned away and walked toward a short set of stairs that returned to the cooperative seating area.[4]

Deputy Gomez approached from behind Mr. Booker to stop him from returning to the cooperative seating area. She reached toward his upper left arm, but he pulled away from her grasp. When she tried again to grab Mr. Booker's arm, he swung his left arm up and away from her. He then turned toward Deputy Gomez and swung his left elbow, nearly striking her head.[5]

2. **Restraining Mr. Booker**

Deputies James Grimes, Kenneth Robinette, Kyle Sharp, and Sergeant Carrie Rodriguez witnessed Mr. Booker swing his elbow at Officer Gomez. According to their affidavits, they viewed Mr. Booker's action as aggressive. They each hurried to help Deputy Gomez, who was trying to restrain Mr. Booker. Within a few seconds, they took Mr. Booker to the ground, where he lay in the "prone" position on his stomach.

Deputy Grimes put Mr. Booker in a "carotid restraint." Appx. at 293, 443-44.

---

[4] According to the Defendants, at this time Mr. Booker yelled more profanities and refused to obey Deputy Gomez's order to enter the cell. The Plaintiffs dispute this, contending Mr. Booker was merely returning to get his shoes before entering cell I-8. Because the Plaintiffs' statement of disputed material facts asserts "there was nothing unusual about Mr. Booker's behavior," Aplt. Appx. at 966, and the video does not suggest otherwise, we must resolve this disputed fact in their favor.

[5] Plaintiffs do not dispute that Mr. Booker swung his elbow toward Deputy Gomez. Nor could they, as the video recording would contradict such an assertion. *See* Appx. at 361 ("2nd angle video"), at 3:35:09-3:35:13. They only respond that his reaction was a natural response and that Deputy Gomez started the altercation by grabbing at him.

-10-

According to the Denver Sheriff Department's training materials, "[t]his technique compresses the carotid arteries and the supply of oxygenated blood to the brain is diminished while concurrently sealing the jugular vein which returns the deoxygenated blood." Appx. at 802.[6] The hold is capable of rendering a person unconscious within "10-20 seconds." *Id.* at 803; *see* Aplt. Br. at 9 (Defendants acknowledging "[a]n effective carotid restraint typically results in the subject going unconscious within five to twenty seconds"). The Sheriff's training materials warn that "[b]rain damage or death could occur if the technique is applied for more than one minute," and "[t]herefore the application of the technique should not be applied for more than one minute." Appx. at 809 (emphasis in original).

Meanwhile, Deputies Robinette and Gomez tried to handcuff Mr. Booker's hands behind his back. Deputy Robinette applied a "gooseneck hold," a pain compliance technique, by bringing Mr. Booker's right hand behind him. Leaning over Mr. Booker, Deputy Robinette swept Mr. Booker's right wrist behind his back for handcuffing. Eventually, Deputies Gomez and Robinette secured Mr. Booker's left wrist for handcuffing. After Mr. Booker was handcuffed, Deputy Robinette put his knee on Mr.

---

[6] The Supreme Court has described the carotid restraint as a "neck restraint" or "chokehold" in which "an officer positioned behind a subject places one arm around the subject's neck and holds the wrist of that arm with his other hand. The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck." *City of Los Angeles v. Lyons*, 461 U.S. 95, 98 n.1 (1983). This is distinct from the more dangerous "bar arm hold," which "applies pressure at the front of the subject's neck, . . . reduces the flow of oxygen to the lungs, and may render the subject unconscious." *Id.*

-11-

Booker's back, applying 50 to 75 percent of his total body weight of approximately 190 pounds.[7] *See* Appx. at 376-77, 448; *see also* Aplt. Br. at 4.

Deputy Sharp used Orcutt Police Nunchakus ("OPN") on Mr. Booker.[8] The OPN is a pain compliance device used to apply pressure on a subject. After Mr. Booker was taken to the ground, Deputy Sharp secured the OPN to his left ankle and applied pressure. After Mr. Booker was handcuffed, Deputy Sharp removed the OPN. Deputy Sharp asserts Mr. Booker then kicked his feet in his direction, but the Plaintiffs deny this allegation. Deputy Sharp reapplied the OPN to Mr. Booker's left ankle and told other deputies Mr. Booker had tried to kick him.

When Mr. Booker was handcuffed and other deputies had control of his limbs, Deputy Grimes requested that a taser be used on Mr. Booker.[9] Sergeant Rodriguez, the on-duty supervisor, was handed a taser and applied the taser in "drive stun mode"[10] to

---

[7] Because we view the evidence in the light most favorable to Plaintiffs, we adopt the 75 percent figure. And because Deputy Robinette was about 190 pounds, he placed roughly 142.5 pounds on Mr. Booker's back—more than Mr. Booker's entire weight of 135 pounds. *Compare* Appx. at 376-77, 620 *with id.* at 450.

[8] A "nunchaku" is a "martial arts weapon [comprising] two pieces of wood or steel connected by a cord or chain and which can be held in the hands. It had its origin as a farm implement in Okinawa." *United States v. George*, 778 F.2d 556, 558 n.1 (10th Cir. 1985).

[9] A taser delivers electricity into a person's body, causing severe pain. *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010).

[10] A taser has two functions, "dart mode" and "drive stun mode." *See Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc). In dart mode, a taser shoots

Continued . . .

-12-

Mr. Booker's leg for eight seconds.[11]  *See* Appx. at 296, 449.  The standard cycle is five seconds.  Aplee. Br. at 4; Appx. at 449.

After Sergeant Rodriguez used the taser on Mr. Booker, Deputy Grimes ended his carotid hold and Deputy Sharp removed the OPN from Mr. Booker's ankle.  Two minutes and 55 seconds expired between the time Deputy Gomez tried to grab Mr. Booker's arm and when Deputy Grimes released the carotid hold.[12]  *See* Appx. at 361 ("2nd angle video"), 3:35:07-3:38:02.

3. **Mr. Booker's Resistance**

The district court did not explicitly state whether there was a genuine issue of material fact as to the level of Mr. Booker's resistance during the use of force.  In their

_____

Cont.

probes into a subject and overrides the central nervous system.  *Id.*  In drive stun mode, "the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system . . . ." *Id.*  Drive stun mode is used as "a pain compliance tool with limited threat reduction." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 726 (7th Cir. 2013) (quotations omitted); *see also Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 757 n.9 (10th Cir. 2013).

[11] Although the taser functioned for only eight seconds, the video evidence shows Sergeant Rodriguez holding it on Mr. Booker for more than 25 seconds.  *See* Appx. at 361 ("2nd angle video"), at 3:37:25-3:37:54.

[12] It is disputed whether Deputy Grimes released the carotid hold intermittently. Plaintiffs' medical expert opined that the level of injury to Mr. Booker suggested Deputy Grimes did not release the hold intermittently.  *See* Appx. at 445-46, 1000.  Because the video does not clearly controvert this disputed fact, we must resolve it in the Plaintiffs' favor.

-13-

affidavits, the officers asserted Mr. Booker resisted efforts to restrain him during virtually the entire use of force. Only after the taser's use, they claim, did Mr. Booker stop resisting.[13] In light of these submissions, the Defendants urge us to rely on the "undisputed testimony of the deputies . . . to augment that which cannot be seen on video." Aplt. Br. at 29. This we cannot do.

Because our record review indicates the primary factual dispute in the district court was Mr. Booker's resistance, we must resolve this dispute in the Plaintiffs' favor on interlocutory review. Our analysis therefore accepts Mr. Booker did not resist during the vast majority of the encounter. The Defendants argue the video evidence belies this conclusion, but they are mistaken.[14] In fact, the video, which shows Mr. Booker

---

[13] The Plaintiffs dispute this fact. They deny that Mr. Booker—who was 56 years old, five foot five inches tall, and 135 pounds—resisted and struggled with the deputies. Plaintiffs allege that, rather than resisting the deputies, Mr. Booker was struggling to breathe while the deputies choked and placed pressure on his back. They also note that Deputy Grimes testified in his deposition that Mr. Booker was fully restrained—deputies controlled all his limbs and his hands were cuffed behind his back—when the taser was used. [Appx. at 450, ¶ 40; Dkt. 110-2 at 196-197]

[14] Plaintiffs also provided a report, completed by the Department, that contains statements of inmates who said Mr. Booker was not struggling much, that he called for help, and that he was struggling to breathe. Defendants argue the inmates' statements are inadmissible double hearsay because they are "statements paraphrased by an officer from the Denver Police Department who wrote down what he was purportedly told by inmates." Aplt. Reply Br. at 3; *see also Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) ("[T]estimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill." (quotations omitted)).

Continued . . .

motionless on the floor while the deputies subdue him, contradicts the Defendants'

assertion that Mr. Booker consistently resisted them.

## 4. **Medical attention**[15]

After restraining Mr. Booker, four deputies lifted him by his limbs and carried him

to cell I-8.  Mr. Booker's condition at this time is disputed.  The officers did not check

Mr. Booker's vitals or attempt to determine whether he needed immediate medical

attention.  They placed him face down on the cell floor.  The deputies removed Mr.

Booker's handcuffs from behind his back and left him alone in the cell.  Approximately a

minute and a half passed between the time the deputies placed Mr. Booker in the cell and

then left the cell.  *See* Appx. at 361 ("I-8 video"), at 3:39:39-3:41:08.

After leaving the cell, Sergeant Rodriguez secured the taser in its designated

storage location and then went to the nurses' office to request that Mr. Booker be

evaluated.  The parties dispute whether Sergeant Rodriguez conveyed that Mr. Booker's

_____

Cont.

Because the video evidence and the deputies' testimony create a genuine issue of material fact regarding Mr. Booker's resistance, we need not resolve the admissibility of the inmates' statements.

[15] The district court did not explicitly identify disputed "issues of fact," Appx. at 1064, regarding the officers' efforts to provide Mr. Booker with medical care after the struggle.  We therefore must "undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to [the Plaintiffs], likely assumed." *Roosevelt-Hennix*, 717 F.3d at 754 (quoting *Jones*, 515 U.S. at 319).  In making this inquiry, we primarily consider the Plaintiffs' Statement of Disputed Facts (ECF No. 133), the video evidence, and the parties' other summary judgment submissions.

condition was an emergency or merely that he was "acting like he's unresponsive." Appx. at 453, 761, 971.

In the meantime, Deputy Sharp returned to the cell about 21 seconds after the other deputies left. *See* Appx. at 361 ("I-8 video"), at 3:41:08-3:41:29. He yelled to Deputy Grimes that Mr. Booker did not appear to be breathing and needed medical attention. Deputy Grimes looked through the cell window and confirmed this observation. Deputy Grimes yelled for others to "step it up." Appx. at 454. Deputy Sharp went to the nurses' station and told a nurse to hurry.

One minute and 31 seconds passed between the time Deputy Sharp returned to cell I-8 and when a nurse arrived at the cell. When the nurse arrived, approximately 4 minutes and 48 seconds had passed since the use of force incident ended.[16] *See* Appx. at 361 ("I-8 video"), at 3:38:02-3:43:00. Attempts to resuscitate Mr. Booker were unsuccessful. He was transported to a nearby hospital, where he was pronounced dead.

The medical examiner opined in the autopsy report that the cause of Mr. Booker's death was "cardiorespiratory arrest during physical restraint." Appx. at 736. The report states,

> The restraints consisted of weight applied to the decedent's

---

[16] Plaintiffs dispute this time estimate, arguing that the video of the use of force does not clearly show when it ended. But Plaintiffs have not provided any competing time estimate. In the absence of such an estimate, we are left to determine, based on the summary judgment submissions and the district court's oral order, what set of facts the district court "likely assumed." *Roosevelt-Hennix*, 717 F.3d at 754 (quoting *Jones*, 515 U.S. at 319).

body while held prone on the floor, application of a carotid "sleeper" hold . . . , application of a Taser to a lower extremity in the "stun drive" mode for 8 seconds, restriction of arm movement by cuffing his hands behind his back, and restriction of leg movement by use of an "OPN" (nunchuk).

*Id.* Mr. Booker's death was listed as a homicide. Plaintiffs' experts opined that Mr. Booker died of asphyxia caused by the deputies' efforts to restrain him. *See* Appx. at 724-25, 825.

## B. *Procedural Background*

### 1. **Complaint and summary judgment**

Mr. Booker's estate filed a civil rights action in Denver County District Court. The Defendants removed the suit to federal court. Plaintiffs' amended complaint named as defendants the four deputies—Gomez, Grimes, Sharp, and Robinette—and Sergeant Rodriguez, both individually and in their official capacities.[17] It also named the City and County of Denver, the Denver Health and Hospital Authority, as well as nurses Gail George and Susan Cryer.[18]

Plaintiffs alleged 10 causes of action. Relevant here are their claims under 42

---

[17] Deputy Robinette's name was inadvertently omitted from the caption, but this error was remedied.

[18] Because only the officers are parties to the instant appeal, we do not discuss in further detail Mr. Booker's claims against the City of Denver, Denver Health and Hospital Authority, or the nurse defendants. A related appeal, No. 12-1386, involved the medical defendants. The Plaintiffs filed a stipulated motion to dismiss that appeal, which this court granted.

U.S.C. § 1983[19] against all the officers for: (1) excessive force in violation of the Fourth Amendment, (2) deprivation of life without due process in violation of the Fourteenth Amendment, and (3) failure to provide medical care. Plaintiffs asserted a fourth claim against Sergeant Rodriguez for (4) failure to train or supervise, resulting in a violation of Mr. Booker's constitutional rights.[20]

In July 2012, the Defendants moved for summary judgment asserting qualified immunity. In support, they submitted video footage of the use of force. The Defendants argued that Plaintiffs' excessive force claim must be reviewed exclusively under the Fourteenth Amendment, not the Fourth Amendment, because Mr. Booker was a pretrial detainee. Defendants analyzed the excessive force claim by reviewing the actions of each deputy individually, not their actions as a whole. Defendants also asserted they were entitled to qualified immunity on the medical care claim and that Sergeant Rodriguez was entitled to qualified immunity on Plaintiffs' claim for supervisory liability.

In response, Plaintiffs contended the Defendants violated Mr. Booker's clearly established right against excessive force under the Fourteenth Amendment. They did not

[19] Plaintiffs also brought conspiracy claims under 42 U.S.C. §§ 1985 and 1986, as well as state law claims. The district court dismissed these claims, and the Plaintiffs have not cross-appealed. We therefore do not consider them here.

[20] Plaintiffs brought all of these claims against the Defendants in both their official and individual capacities. Because the Defendants only appeal the district court's denial of qualified immunity on the claims brought against them in their individual capacity, our discussion is limited to those claims. That the Plaintiffs' claims against the Defendants in their "official capacit[ies] remain[] pending below does not prevent us from reviewing [the Defendants'] qualified immunity defense to the claim[s] against [them] in [their] individual capacit[ies]." *Brown v. Montoya*, 662 F.3d 1152, 1161 n.6 (10th Cir. 2011).

dispute Defendants' argument against analyzing the excessive force claim under the Fourth Amendment. In response to Defendants' focus on the acts of each deputy, Plaintiffs argued that each deputy had a clearly established duty to intervene to stop the excessive force of others, regardless of whether an individual's conduct was excessive. Plaintiffs also argued the deputies violated Mr. Booker's clearly established right to medical care through their deliberate indifference to his severe condition. Finally, Plaintiffs asserted factual disputes precluded summary judgment on the supervisory liability claim against Sergeant Rodriguez.

## 2. **District court's order**

On December 5, 2012, the district court heard argument on Defendants' summary judgment motion. Plaintiffs' counsel argued that "the excessive force claim ought to be analyzed under the Fourteenth Amendment, not the Fourth Amendment, because Mr. Booker was a pretrial detainee." Appx. at 1031. Plaintiffs' counsel also stated the excessive force claim was "viable under the Fourth or Fourteenth Amendment," but he did not want to "tak[e] time in this hearing [on that issue] because [he did not] think the viability of the claim[] sinks or swims at the summary judgment [stage] on that distinction." *Id.* Defendants' counsel contended the proper analysis was under the Fourteenth Amendment.

Ruling from the bench, the district court denied Defendants' summary judgment motion with respect to the excessive force, medical care, and supervisory liability

claims.[21]  *See* Appx. at 1060 ("The motion is denied with respect to claims one, two,

three, four.").  As to excessive force, the district court thought the proper analysis was

under the Fourth Amendment, not the Fourteenth Amendment, although it saw this

question of the applicable amendment as a "gray area."  *Id.* at 1061.  Nevertheless, the

district court concluded the Plaintiffs had shown the Defendants violated Mr. Booker's

rights under either amendment.  *See id.* at 1063 ("I think the first requirement to defeat

qualified immunity clearly exists in one of the two constitutional pegs.").

As to whether the constitutional violation was clearly established, the district court

observed the following:

> Given the version of the facts that the plaintiff alleges—and
> they more than just allege it, there is video, which is subject
> to interpretation, there is apparently testimony from inmates
> who observed these proceedings, this incident and so forth—
> if what happened is what the plaintiff claims, then any
> reasonable officer in Denver or anywhere else would know
> that that was excessive force.  It's just not even a close call.

*Id*. at 1063-64.  The court continued:  "The entire excessive force part of this case is *just*

*riddled with fact disputes*.  They're set forth in some summary at CM-ECF docket no.

133, but they're just everywhere in this case. . . .  [E]very [claim] turns on issues of fact;

and for that reason, this is not, in my view, even a close call."  *Id.* at 1064 (emphasis

added).[22]

---

[21] There is no written summary judgment order, only the transcript of the hearing.
[22] ECF No. 133 is the "Plaintiffs' Supplemental Response to Law Enforcement
Defendants' Combined Motion for Summary Judgment."  *See* Appx. at 966.  After

Continued . . .

The district court did not specifically discuss the medical care or supervisory liability claims at the hearing, but it denied summary judgment on those claims because each turned on "issues of fact." *Id.* at 1064. The Defendants appealed.

## III. DISCUSSION

We discern five issues from the Defendants' appeal: (A) whether the district court erred by considering Plaintiffs' excessive force claim under both the Fourth and the Fourteenth Amendment standards; (B) whether the district court erred in failing to conduct an individualized analysis of each Defendant's actions; (C) whether the district court erred in denying qualified immunity on Plaintiffs' excessive force claim; (D) whether the district court erred in denying qualified immunity on Plaintiffs' claim for failure to provide medical care; and (E) whether the district court erred in failing to grant qualified immunity to Sergeant Rodriguez on the Plaintiffs' supervisory liability claim.

With jurisdictional limits in mind—we may consider only abstract issues of law, not factual disputes—"we review the district court's denial of a summary judgment motion asserting qualified immunity de novo." *Fancher v. Barrientos*, 723 F.3d 1191, 1194 (10th Cir. 2013). Because Defendants have asserted qualified immunity, it is the

_____

Cont.

Defendants filed a 54-page summary judgment memorandum and Plaintiffs responded with a 100-page memorandum with 475 pages of exhibits, the district court criticized the parties' motion practice as having "run amuck [sic]." Appx. at 956. It ordered Plaintiffs to submit a supplement to their response memorandum "that specifically identifies what genuine issues of material fact exist and what evidence shows that these issues are disputed." *Id.* at 956-57. ECF No. 133 is that supplemental response.

-21-

Plaintiffs' burden to show with respect to each claim that (1) a reasonable jury could find facts supporting a violation of a constitutional right that (2) was clearly established at the time of the Defendants' conduct. *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *see also Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011); *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

A. ***The District Court Did Not Err by Addressing Both the Fourth and Fourteenth Amendment Standards.***

Defendants contend the district court erred by analyzing Mr. Booker's claims under a Fourth Amendment excessive force standard. They argue that because Mr. Booker was arrested pursuant to a warrant supported by probable cause—as opposed to a person seized without a warrant and prior to a probable cause determination—a Fourteenth Amendment analysis applies. They read the district court's decision to address only the Fourth Amendment. Although we agree the Fourteenth Amendment governs the Plaintiffs' excessive force claim, we disagree with the Defendants' characterization of the district court's ruling.

1. **Legal Standard**

"Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment . . . and each carries with it a very different legal test." *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010). For instance, although an excessive force claim brought under the Fourth Amendment depends on the objective reasonableness of

the defendants' actions, the same claim brought under the Fourteenth Amendment turns on additional factors, including "the motives of the state actor." *See id.* at 1325-26. Thus, a district court evaluating an excessive force claim must first "isolate the precise constitutional violation with which [the defendant] is charged" because "[t]he choice of amendment matters." *Id.* at 1325 (citing *Baker v. McCollan*, 443 U.S. 137, 140 (1979)); *see also Graham v. Connor*, 490 U.S. 386, 393-95 (1989).

Determining which amendment applies to an allegation of excessive force requires consideration of "where the [plaintiff] finds himself in the criminal justice system." *Porro*, 624 F.3d at 1325. Any force used "leading up to and including an arrest" may be actionable under the Fourth Amendment's prohibition against unreasonable seizures. *Id.* at 1325-26. By contrast, claims of excessive force involving convicted prisoners arise under the Eighth Amendment. *Id.* "And when neither the Fourth nor Eighth Amendment applies—when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment—we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities." *Id.* at 1326 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998)).

It is therefore well-established that the Fourteenth Amendment governs any claim of excessive force brought by a "pretrial detainee"—one who has had a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Bell v. Wolfish*, 441 U.S. 520, 536 (1979) (quoting *Gerstein v.*

-23-

*Pugh*, 420 U.S. 103, 114 (1975)); *see also Graham*, 490 U.S. at 395 n.10. For similar reasons, we have also concluded that the Fourteenth Amendment standard "controls excessive force claims brought by federal immigration detainees." *Porro*, 624 F.3d at 1326.

On the other hand, we have held that the Fourth Amendment, not the Fourteenth, governs excessive force claims arising from "treatment of [an] arrestee detained *without a warrant*" and "*prior to* any probable cause hearing." *Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991) (emphasis added), *abrogated on other grounds by Johnson v. Jones*, 515 U.S. 304 (1995).

2. **Analysis**

   a. *The district court correctly concluded that summary judgment was inappropriate under either standard.*

We conclude the district court did not err in considering Plaintiffs' excessive force claim under both the Fourth and Fourteenth Amendments. Rather, the district court did what many courts do: it analyzed the case under more than one legal rule and made alternative rulings, holding that Defendants were not entitled to qualified immunity on Plaintiffs' excessive force claim under *either* the Fourth or Fourteenth Amendment. *See Murrell v. Shalala*, 43 F.3d 1388, 1389 (10th Cir. 1994) ("Whatever the particular result in any given case, the use of alternative dispositions generally benefits everyone."). At the hearing, the district court expressly observed "[i]f [the Plaintiffs] could prove what they've said happened, [the Defendants are] going to get clobbered under *any excessive*

-24-

*force standard*, right? If they could prove these facts, as they allege them, [the Defendants are] dead in the water, *whether it's the Fourteenth or the Fourth*." Appx. at 1039 (emphasis added).

In *Culver v. Town of Torrington, Wyo.*, 930 F.2d 1456 (10th Cir. 1991), we addressed a similar issue where "[t]he trial court did not state which [excessive force] standard it was applying" in the context of "a post-arrest pre-trial detention setting." *Id.* at 1457, 1460. We reasoned that we did not have to "determine whether to apply the Fourteenth or Fourth Amendment standard since there [was] no practical difference in the application of the two standards in [that] case." *Id.* We agreed with the trial court that the appellant's excessive force claim failed under either standard. *Id.* at 1461. *Culver* supports the district court's approach in this case. *See also Austin*, 945 F.2d at 1158 ("[W]e hold that *under either a fourth amendment or substantive due process standard*, a reasonable officer could not have believed the manner of plaintiffs' arrest and detention in this case to be constitutionally permissible, in light of the clearly established law and the information defendants possessed at the time." (quotations and citations omitted)); *Martin v. Bd. of Cnty. Comm'rs*, 909 F.2d 402, 407 n.5 (10th Cir. 1990) (same).

We disagree with the Defendants that the district court's approach requires reversal.

b. *The Fourteenth Amendment standard governs Plaintiffs' excessive force claim.*

We nonetheless agree with the Defendants—and the Plaintiffs concede[23]—that the Fourteenth Amendment is the applicable amendment for the excessive force claim in this case. The Fourth Amendment, by its plain terms, prohibits only "unreasonable seizures." U.S. Const. amend. IV. It says nothing about the treatment owed to a detainee *after* he or she has been lawfully seized pursuant to probable cause. Although we have recognized that a "continuing seizure" may extend beyond arrest up until a probable cause determination, *see Austin*, 945 F.2d at 1160, the Supreme Court has observed that the "Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n.10; *see also Bell v. Wolfish*, 441 U.S. 520, 533 (1979) ("We do not doubt that the Due Process Clause protects a detainee from certain conditions and restrictions of pretrial detainment.").

In this case, unlike the plaintiff in *Austin*—where the excessive force occurred before a probable cause determination and thus constituted a continuing seizure under the Fourth Amendment, *see* 945 F.2d at 1160—Mr. Booker was arrested pursuant to a warrant based on probable cause for failing to appear at a court proceeding in conjunction with drug charges. Although there was no probable cause determination on the drug

---

[23] In their amended complaint, the Plaintiffs characterized the excessive force claim as arising under the Fourth Amendment. In their response to the Defendants' motion for summary judgment, however, the Plaintiffs did not mention the Fourth Amendment and explicitly argued the excessive force claim under the Fourteenth Amendment. At the summary judgment hearing, Plaintiffs' counsel asserted "the excessive force claim ought to be analyzed under the Fourteenth Amendment, not the Fourth Amendment, because Mr. Booker was a pretrial detainee." Appx. at 1031.

charges, there was a probable cause determination for Mr. Booker's failure to appear. In this important respect, our holding in *Austin* does not control this case. After the officers arrested Mr. Booker and brought him into the "cooperative seating area" for booking, he was a "pretrial detainee." Like the immigration detainee in *Porro* whose excessive force claim arose under the Fourteenth Amendment because he did not "dispute that he had been lawfully seized and detained," 624 F.3d at 1326, Mr. Booker's claim is governed by the Fourteenth Amendment's Due Process Clause.

Accordingly, we hold the Fourteenth Amendment standard governs excessive force claims arising from post-arrest and pre-conviction treatment if the arrestee has been taken into custody pursuant to a warrant supported by probable cause.

### B. *Individualized Analysis of the Officers' Use of Force*

Defendants argue the district court should have assessed their actions individually, rather than "judging the conduct of all the deputies as a whole . . . ." Aplt. Br. at 24. We disagree and conclude that individualized analysis was not necessary at the summary judgment stage in this case.

### 1. **Legal Standard**

Although we frequently conduct separate qualified immunity analyses for different defendants, we have not always done so at the summary judgment stage of excessive force cases. Where appropriate, we have aggregated officer conduct. *See, e.g.*, *Lundstrom v. Romero*, 616 F.3d 1108, 1126-27 (10th Cir. 2010); *Fisher v. City of Las Cruces*, 584 F.3d 888, 895-902 (10th Cir. 2009); *York v. City of Las Cruces*, 523 F.3d

1205, 1210-11 (10th Cir. 2008). In *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008), for instance, two officers handcuffed an arrestee and bound his legs. For three minutes, one of the officers applied pressure to the man's upper torso as the man lay on his stomach, while the other officer went to warm his hands in the police cruiser. The man died of asphyxiation, and his estate sued both officers under § 1983. Even though only one officer placed pressure on the victim's back, we did not perform separate analyses for the two officers and denied qualified immunity for both of them. *See id.* at 1155.

At other times, we have analyzed officer action individually, but we have still denied qualified immunity when an officer failed to prevent others from using excessive force even though the officer himself did not engage in excessive force. *See, e.g.*, *Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006) ("We will consider the officers' conduct separately for purposes of this de novo [qualified immunity] inquiry."); *Currier v. Doran*, 242 F.3d 905, 919-25 (10th Cir. 2001) (same in the context of social workers sued under § 1983). For example, in *Casey v. City of Federal Heights*, 509 F.3d 1278, 1280-81 (10th Cir. 2007), two officers used force on a plaintiff who removed a file from a courthouse, which was a misdemeanor. One officer tackled the plaintiff, and the other used a taser on him. *See id.* As part of our qualified immunity analysis, we "discuss[ed] the liability of [the officers] individually." *Id.* at 1281. We determined that each officer violated the plaintiff's clearly established constitutional rights, and that the officer who tackled the plaintiff could be held liable under § 1983 for doing "nothing to prevent [the second officer] from Tasering him and other officers from beating him." *Id.* at 1283.

2. **Analysis**

We conclude the district court's failure to conduct an individualized analysis is not reversible error because the facts show that: (1) all Defendants actively and jointly participated in the use of force, and (2) even if a single deputy's participation did not constitute excessive force, that deputy could be liable under a failure-to-intervene theory.

a. *Active participation*

First, all Defendants actively participated in a coordinated use of force on Mr. Booker: Deputy Grimes applied the carotid hold; Deputy Gomez helped handcuff Mr. Booker; Deputy Robinette handcuffed him and applied pressure to his back; Deputy Sharp applied the OPN; and Sergeant Rodriguez used the taser. If excessive force occurred,[24] all deputies contributed to it. *See Bletz v. Gribble*, 641 F.3d 743, 754 (6th Cir. 2011) ("[A] police officer may be responsible for another officer's use of excessive force if the officer . . . actively participated in the use of excessive force." (quotations omitted)); *see also Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) (applying in excessive force suit under § 1983 the "axiomatic" principle "that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury"). Because the Defendants here engaged in a group effort, a reasonable jury could find them liable for any underlying finding of excessive force.

---

[24] We address below the Defendants' contention that they are entitled to qualified immunity as a matter of law on Plaintiffs' excessive force claims.

-29-

b. *Failure to intervene*

Second, even if a single deputy's use of force was not excessive, "a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983." *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996). Thus, even if one of the defendant deputies did not use excessive force, a reasonable jury could nonetheless find on this record that he or she violated Mr. Booker's clearly established rights by not taking steps to prevent other deputies' excessive force. *See Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.").[25] In *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008), we affirmed the district court's denial of qualified immunity on a failure to intervene claim because the defendant was present during the allegedly

---

[25] Other circuits have reached similar conclusions, including junior officer liability. *See, e.g.*, *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981) ("We conclude although Crowe was a subordinate the evidence is sufficient to hold him jointly liable for failing to intervene if a fellow officer, albeit his superior, was using excessive force and otherwise was unlawfully punishing the prisoner."); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972) ("[T]he same responsibility must exist as to nonsupervisory officers who are present at the scene of such summary punishment, for to hold otherwise would be to insulate nonsupervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace."); *see also Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002) (same); *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (same); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (same).

unconstitutional arrest, which lasted "between three and five minutes." *Id.* at 1164.

Here, Plaintiffs alleged and the video confirmed that all of the Defendants were present and observed the entire use of force over a two-to-three minute period. Because "Plaintiffs presented evidence suggesting that [the Defendants] could have prevented or stopped" the assault on Mr. Booker, *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir. 1994), *vacated on other grounds sub nom. City of Lawton, Okla. v. Lusby*, 474 U.S. 805 (1985), a reasonable jury could find any given defendant here liable for failing to intervene. *See Mick*, 76 F.3d at 1137 (reasoning a "sworn affidavit by an eyewitness to the effect that [the defendant] watched the [excessive force] incident and did nothing to prevent it" precluded summary judgment for defendant based on qualified immunity for failure to intervene claim).

\*　　　\*　　　\*

Under either theory, if Mr. Booker was the victim of excessive force—which we address in greater detail below—a reasonable jury could find each deputy subject to § 1983 liability for violating his clearly established rights. Accordingly, we hold that the district court did not err by failing to engage in an individualized inquiry at the summary judgment stage.

C. *Qualified Immunity on Plaintiffs' Fourteenth Amendment Excessive Force Claim*

Defendants argue they are entitled to qualified immunity on the Plaintiffs' excessive force claim. We disagree, largely because we may not resolve critical factual disputes—such as whether Mr. Booker resisted during the entire encounter—in the

Defendants' favor.

1. **Legal Standard**

As noted above, "when the plaintiff finds himself in the criminal justice system somewhere between . . . an initial seizure and post-conviction punishment . . . we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities." *Porro*, 624 F.3d at 1326. An excessive force claim under the Fourteenth Amendment targets "arbitrary governmental action, taken without due process . . . ." *Id.* We have said that "[f]orce inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment." *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) (quotations omitted). To determine whether a use of force is excessive under the Fourteenth Amendment we consider three factors: "(1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor." *Id.*

"How much one due process 'factor' may 'balance' against another is the subject of little discussion in our case law." *Porro*, 624 F.3d at 1327 n.1. We have, however, described the standard as a "high threshold." *Bella v. Chamberlain*, 24 F.3d 1251, 1257 (10th Cir. 1994).

2. **Qualified Immunity**

The Defendants are entitled to qualified immunity unless the Plaintiffs can show

(a) a reasonable jury could find unconstitutional the deputies' use of force—a carotid

restraint, pressure on Mr. Booker's back, and application of a taser—once Mr. Booker

was fully restrained; and (b) this use of force violated clearly established law.  *See*

*Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *see also Pearson v. Callahan*,

555 U.S. 223, 232 (2009).  For the following reasons, we conclude the Plaintiffs have met

both of these burdens and affirm the district court's denial of qualified immunity on

Plaintiffs' excessive force claim.

      a.  *Qualified immunity—constitutional violation*

As noted above, we look to three factors in evaluating an excessive force claim

under the Fourteenth Amendment:  "(1) the relationship between the amount of force

used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of

the state actor."  *Porro*, 624 F.3d at 1326 (quoting *Roska*, 328 F.3d at 1243).  We address

them in turn.

      i.  <u>Relationship between the force used and the need presented</u>

The evidence, when viewed in the light most favorable to the Plaintiffs, shows the

deputies used various types of force—including substantial pressure on his back, a taser,

and a carotid neckhold—on Mr. Booker while he was not resisting.  Because Mr. Booker

was handcuffed and on his stomach, we conclude the force was not proportional to the

need presented.

      1)  Pressure on back

In *Weigel*, we agreed with other circuits that it was "clearly established that

-33-

putting substantial or significant pressure on a suspect's back while that suspect is in a

face-down prone position after being subdued and/or incapacitated constitutes excessive

force." 544 F.3d at 1155 (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893,

903 (6th Cir. 2004)); *see also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d

1052, 1061-62 (9th Cir. 2004); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 449-51

(5th Cir. 1998).[26] Here, Deputy Robinette placed an estimated 142.5 pounds—more than

Mr. Booker's overall weight—on Mr. Booker's back while he was handcuffed on his

stomach. Because of Mr. Booker's prone, restrained, position, the placement of weight

exceeding Mr. Booker's total body weight could be construed as substantial or

significant.

> ### 2) Taser

Under prevailing Tenth Circuit authority, "it is excessive to use a Taser to control

---

[26] We recognize that much of the case law we rely upon in this subsection deals with excessive force claims under the Fourth, not the Fourteenth, Amendment. Although the two standards are different, a finding of "excessive force" under the Fourth Amendment is highly relevant to the "relationship between the amount of force used and the need presented" in the first part of an excessive force inquiry under the Fourteenth Amendment. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (evaluating reasonableness of seizure under the Fourth Amendment requires "careful attention" to facts such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"). For instance, in *Clark v. Edmunds*, 513 F.3d 1219 (10th Cir. 2008), we cited a Fourth Amendment excessive force case to support our conclusion that an officer's actions were warranted under the Due Process Clause. *Id.* at 1223 (citing *Thompson v. City of Lawrence, Kan.*, 58 F.3d 1511, 1517 (10th Cir. 1995)); *see also Porro*, 624 F.3d at 1329 (citing Fourth Amendment excessive force case with approval in resolving excessive force claim involving use of a taser under the Fourteenth Amendment).

a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *Casey*, 509 F.3d at 1286. This principle applies here. Sergeant Rodriguez used the taser on Mr. Booker for three seconds longer than recommended when he was already handcuffed on the ground and subdued by multiple deputies. A reasonable jury could conclude that a lesser degree of force would have exacted compliance and that this use of force was disproportionate to the need. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) (use of taser unconstitutional where jury could "conclude that [the victim] did not pose an immediate threat" to officer or others and where victim was not actively resisting); *Porro*, 624 F.3d at 1329 ("The use of tasers in at least some circumstances—such as in a *good faith effort to stop a detainee who is attempting to inflict harm on others*—can comport with due process." (emphasis added)); *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007) (finding excessive force where plaintiff did not "actively resist[ ] seizure" and "cooperated fully").

### 3) Carotid restraint/chokehold

Deputy Grimes used the carotid restraint for approximately two and a half minutes even though he was trained to use it for only one minute. *See Weigel*, 544 F.3d at 1155 ("[T]he reasonableness of an officer's actions must be assessed in light of the officer's training."); Appx. at 809 (Denver Sheriff's training materials recommending against "application of the technique" for "more than one minute" because "[b]rain damage or death could occur if the technique is applied for more than one minute" (emphasis in

original)).  Further, Deputy Grimes continued to use the restraint while Mr. Booker was handcuffed in a prone, face-down position on the ground.  Courts from various jurisdictions have held the use of such force on a non-resisting subject to be excessive.  *See United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999) (upholding excessive force verdict where officer put victim in choke hold for one minute to render victim unconscious, and where department prohibited such holds); *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993) (upholding district court's determination that the defendants' use of a "choke hold and other force . . . to subdue a non-resisting [detainee] and render him temporarily unconscious" constituted excessive force under the Due Process Clause); *Papp v. Snyder*, 81 F. Supp. 2d 852, 857 (N.D. Ohio 2000) (denying qualified immunity where jury could conclude that officer used a choke hold and carotid hold when the victim was restrained by others and handcuffed); *McQurter v. City of Atlanta, Ga.*, 572 F. Supp. 1401, 1414 (N.D. Ga. 1983) (use of chokehold was "excessive and malicious" when used after victim was "manacled" and "effectively restrained"), *abrogated on other grounds by Budinich v. Bectson Dickinson & Co.*, 486 U.S. 196 (1988).[27]

---

[27] In *Gouskos v. Griffith*, 122 F. App'x 965 (10th Cir. 2005) (unpublished), we reversed a grant of qualified immunity where the plaintiff submitted evidence that an officer put "him in a chokehold and chok[ed] him almost to unconsciousness when he was already on the ground, he was exclaiming that he was not resisting, and three other officers were sitting on him, holding his legs, and handcuffing him . . . ." *Id.* at 976. Although unpublished, *Griffith*'s reasoning is persuasive for chokehold cases in which individuals were handcuffed and/or not resisting. *See* 10th Cir. R. 32.1 ("Unpublished

Continued . . .

Given the length of time Deputy Grimes used the carotid restraint,[28] his training to the contrary, the factual dispute over whether he released the hold intermittently, and that Mr. Booker was otherwise restrained for a significant period when the hold was used, a reasonable jury could conclude Deputy Grimes' use of the hold was disproportionate to the need for force.

### ii. The extent of the injury inflicted

This factor weighs considerably in Plaintiffs' favor. The autopsy report concluded that Mr. Booker died of cardiorespiratory arrest as a result of restraint. *See* Appx. at 736. The report describes the carotid hold, the pressure on Mr. Booker's back, and the taser as contributing to Mr. Booker's death. *See id.* Plaintiffs' experts also opine that he died of asphyxia caused by the deputies' restraints, *see* Appx. at 725, 825, and we may not weigh their credibility on appeal. *See Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1110 (9th Cir. 2013) (reversing grant of qualified immunity because district court improperly weighed expert testimony in determining "that Defendants' conduct was not a substantial factor in [the victim's] death").

A reasonable jury could conclude this evidence of Mr. Booker's cause of death

_____

Cont.

opinions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

[28] As previously discussed, *see supra* note 12, the Defendants assert Deputy Grimes released the hold intermittently, but we lack jurisdiction to resolve this disputed fact in their favor.

-37-

supports the Plaintiffs' claim of excessive force.  *See Martin v. Bd. of Cnty. Comm'rs*, 909 F.2d 402, 407 (10th Cir. 1990) (upholding excessive force claim where police officers' unreasonable conduct in transporting woman from hospital to prison aggravated an existing fracture in her neck).

### iii. The motives of the state actor

Defendants argue the Plaintiffs failed to demonstrate their requisite subjective intent to harm Mr. Booker.  We disagree.

In *Hannula v. City of Lakewood*, 907 F.2d 129, 132 (10th Cir. 1990), *abrogated in part by Graham*, 490 U.S. at 394-95, we described the subjective intent standard for an excessive force due process violation as "[f]orce inspired by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience, or by malice rather than mere carelessness."  *Id.* (quotations omitted); *see also Porro*, 624 F.3d at 1326 (same).  Similarly, in *Cortez*, we described the due process standard as "requir[ing] that the force be inspired by malice or by excessive zeal that shocks the conscience."  478 F.3d at 1129 n.24.

We have granted qualified immunity in the absence of any evidence meeting this standard.  In *Hannula*, for example, we held that a § 1983 plaintiff failed to show the defendant violated clearly established law in part because the evidence—that the arresting "officer appeared angry"—did "not establish" malice in the absence of any additional proof.  907 F.2d at 132.  In *Roska ex rel. Roska v. Patterson*, 328 F.3d 1230 (10th Cir. 2003), we affirmed dismissal of an excessive force claim under the Fourteenth

Amendment in part because "nothing in the record indicate[d] that the defendants were motivated by malice or other improper motive." *Id.* at 1243. Finally, in *Bella v. Chamberlain*, 24 F.3d 1251, 1258 (10th Cir. 1994), we faulted a plaintiff for "mak[ing] no allegations of improper motives or malice," nor could we infer any from the facts.

But in these cases, reasons other than motive foreclosed plaintiffs' excessive force claims, such as evidence of proportional force or de minimis physical injury. *See Cortez*, 478 F.3d at 1129 (de minimis injury); *Roska*, 328 F.3d at 1233 ("no serious physical injury was inflicted"); *Bella*, 24 F.3d at 1258-59 (force not disproportionate to need); *Hannula*, 907 F.2d at 132 (no proof of substantial force and injury was minimal). Defendants have not cited, and we have not found, any case in this circuit that disposed of a due process excessive force claim solely on the "motive" factor when disproportionate force and serious injury were present. Indeed, in *Porro*, we said that "[h]ow much one due process 'factor' may 'balance' against another is the subject of little discussion in our case law" and that this court usually has "examined an officer's motive in combination with the [other] factors." 624 F.3d at 1327 n.1.

Moreover, based on several facts in the record that we must view in the light most favorable to the Plaintiffs, a reasonable jury could find excessive zeal behind the use of force on Mr. Booker. First, the carotid restraint was used for approximately two and a half minutes. Defendants acknowledge that "deputies are instructed about the risk associated with a continuous one minute application of the hold." Aplt. Br. at 35; *see also* Appx. at 809 ("[b]rain damage or death" (emphasis in original)). Deputy Grimes'

-39-

actions conflicted with Denver Sheriff Department policy and training. In addition, he continued the hold after Mr. Booker was handcuffed, suggesting that the carotid restraint was no longer necessary to maintain and restore discipline.

Second, not only was the taser used while Mr. Booker was handcuffed and otherwise restrained by deputies, it was used for eight seconds. Sergeant Rodriguez admitted in her deposition that she was trained to use a standard taser "cycle" of up to five seconds. A jury could conclude that a 60 percent upward departure from a normal cycle on a handcuffed man demonstrates excessive zeal. Further, although the taser only functioned for eight seconds, the video shows Sergeant Rodriguez holding it on Mr. Booker for upward of 25 seconds. *See* Appx. at 361 ("2nd angle video"), at 3:37:25-3:37:54.

In light of the foregoing, a reasonable jury could conclude that the Defendants' use of substantial pressure on Mr. Booker's back, a two-minute carotid hold on his neck, and a taser while Mr. Booker was subdued and struggling to breathe in a prone position demonstrated the requisite level of culpability for a due process violation.

*       *       *

We hold that the Plaintiffs met their burden to show the Defendants violated Mr. Booker's constitutional rights because a reasonable jury could conclude the Defendants engaged in excessive force in violation of the Due Process Clause.

b. *Qualified Immunity—clearly established law*

Defendants argue they are entitled to qualified immunity because their actions did

-40-

not violate clearly established law. We disagree.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Fogarty*, 523 F.3d at 1161 (quotations omitted). In the Fourth Amendment context, we have said that "because excessive force jurisprudence requires an all-things-considered inquiry with careful attention to the facts and circumstances of each particular case, there will almost never be a previously published opinion involving exactly the same circumstances. We cannot find qualified immunity whenever we find a new fact pattern." *Casey*, 509 F.3d at 1284 (citation omitted) (quotations omitted). We have therefore "adopted a sliding scale to determine when law is clearly established" in which "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (quotations omitted).

Defendants assert that Plaintiffs cannot rely on Fourth Amendment case law to show that any violation of Mr. Booker's constitutional rights was clearly established. They argue the "Plaintiffs failed to identify any due process case involving a use of force in a correctional setting that would have put any of the deputies on notice that the force that was used—either individually or collectively—was unconstitutional." Aplt. Br. at 46.

The Defendants are mistaken. As noted above, Fourth Amendment case law addressing whether force is "reasonable" is relevant to the first due process excessive

-41-

force factor: the relationship between the amount of force used and the need presented. *See supra*, note 26. Cases finding force to be unreasonable necessarily imply that the use of force was disproportionate to the need presented. Indeed, the *Graham* Fourth Amendment excessive force factors are consistent with the disproportionate force analysis under the Fourteenth Amendment: (1) the severity of the offense, (2) whether the subject posed an immediate threat to the safety of officers or others, and (3) whether the subject resists officers. *See Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

This "Fourth or Fourteenth Amendment" issue arose in *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009), where defendants argued that excessive force law was not clearly established because it was unclear whether the Fourth or Fourteenth Amendment applied. The Sixth Circuit rejected this "argument because even if there were some lingering ambiguity as to whether the Fourth or the Fourteenth Amendment applies in this precise context, the 'legal norms' underlying [plaintiff's] claims nevertheless were clearly established." *Id.* Specifically, the *Harris* court observed, "there undoubtedly is a clearly established legal norm" precluding the use of violent physical force against a criminal suspect or detainee "who already has been subdued and does not present a danger to himself or others." *Id.*

We agree with the Sixth Circuit's analysis, which is consistent with Supreme Court law. *See Saucier v. Katz*, 533 U.S. 194, 202-03 (2001) ("Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under

-42-

facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard."), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Bailey v. Pataki*, 708 F.3d 391, 405 (2d Cir. 2013) ("For a right to be clearly established, it is not necessary that courts have agreed 'upon the precise formulation of the standard.'" (quoting *Saucier*, 533 U.S. at 202)).

Here, despite any uncertainty about which constitutional amendment governs the Plaintiffs' excessive force claim, the "legal norms" underlying the three-factor due process analysis—proportionality, injury, and motive—were clearly established at the time of Mr. Booker's death. *Weigel* (pressure on back), *Casey* (taser), and the weight of authority from other jurisdictions (neck restraint)[29] put Defendants on notice that use of such force on a person who is not resisting and who is restrained in handcuffs is disproportionate. *See also Richman v. Sheahan*, 512 F.3d 876, 880 (7th Cir. 2008) ("[Hypoxia] can also be induced by compressing the lungs, which the weight of several

---

[29] *See supra* Part III.C.2.a.i.3 (discussing cases from the Second Circuit, Fifth Circuit, and various district courts).

Also as discussed above, *see supra* note 27, we reversed a grant of qualified immunity under similar circumstances in *Gouskos*, 122 F. App'x at 976-76. Although not dispositive of our inquiry because of its unpublished status, *Gouskos* need not be ignored in determining whether the law was clearly established. *See Morris v. Noe*, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012) (A single "unpublished opinion provides little support for the notion that the law is clearly established on a given point," but "we have never held that a district court must ignore unpublished opinions in deciding whether the law is clearly established." (quotations omitted)).

persons on one's back can do. So police are warned not to sit on the back of a person they are trying to restrain. . . ."); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("The officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable."); *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993) (excessive under Due Process Clause to use "choke hold and other force . . . to subdue a non-resisting [detainee] and render him temporarily unconscious"). Each of these cases also put the Defendants on notice that significant injury, including death, could result from their use of force. Finally, Defendants were on notice that a reasonable jury could find them liable under § 1983 for engaging in "[f]orce inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience . . . ." *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1279 (10th Cir. 2003) (quotations omitted).

\* \* \*

Mr. Booker was handcuffed, prone on his stomach, and not resisting while much of the disproportionate use of force occurred. We conclude not only that a reasonable jury could find the Defendants violated Mr. Booker's due process right, but also that this right was clearly established at the time of their conduct. We therefore affirm the district court's denial of summary judgment on Plaintiffs' excessive force claim.

D. *The Defendants Are Not Entitled to Qualified Immunity on Mr. Booker's Claim for Denial of Medical Care.*

-44-

The Defendants argue the district court erred by denying their motion for summary judgment on Plaintiffs' due process claim for denial of medical care. We hold otherwise.

1. **Legal Standard**

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104 (citation omitted) (quotations omitted). Prison doctors and prison guards may thus be liable under § 1983 for "indifference . . . manifested . . . in their response to the prisoner's needs or by . . . intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed." *Id.* at 104-05 (footnotes omitted). We have applied the *Estelle* rule to treatment of pretrial detainees, holding that "pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates." *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985); *see Howard v. Dickerson*, 34 F.3d 978, 980 (10th Cir. 1994) (same). It is therefore "proper to apply a due process standard which protects pretrial detainees against deliberate indifference to their serious medical needs." *Garcia*, 768 F.2d at 307.

To state a denial of medical care claim, a plaintiff must satisfy "both an objective and a subjective component." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)

(quotations omitted).[30]  First, the detainee must "produce objective evidence that the

deprivation at issue was in fact sufficiently serious." *Id.* (quotations omitted).  "[A]

medical need is sufficiently serious if it is one . . . that is so obvious that even a lay

person would easily recognize the necessity for a doctor's attention." *Id.* (quotations

omitted); *see also Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (same).

Second, under the subjective component, the detainee must establish deliberate

indifference to his serious medical needs by "present[ing] evidence of the prison

official's culpable state of mind." *Mata*, 427 F.3d at 751.  He must show that the prison

"official acted or failed to act despite his knowledge of a substantial risk of serious

harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  "The Supreme Court [has]

cautioned that 'an inadvertent failure to provide adequate medical care' does not rise to a

constitutional violation." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)

(quoting *Estelle*, 429 U.S. at 105-06).   But "[w]hether a prison official had the requisite

knowledge of a substantial risk is a question of fact subject to demonstration in usual

ways, including *inference* from circumstantial evidence." *Gonzalez v. Martinez*, 403 F.3d

1179, 1183 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 842).  Although not

---

[30] Because "pretrial detainees are in any event entitled to the degree of protection against denial of medical attention which applies to convicted inmates," *Garcia*, 768 F.2d at 307, we rely on Eighth Amendment cases in our discussion of the legal standard for a failure to provide medical care claim. *See also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) ("Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." (quotations omitted)).

dispositive, an official's training may undermine his or her claim that he or she was unaware of such a risk. *See Mata*, 427 F.3d at 757 ("While published requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm."). In any event, "the factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

2. **Analysis**

Because (a) a reasonable jury could find the Defendants were deliberately indifferent to Mr. Booker's serious medical need and (b) this would violate clearly established law, we affirm the district court's denial of qualified immunity.

a. *A reasonable jury could find a due process violation.*

i. <u>Objective component (seriousness of medical need and causation)</u>

Although the Defendants concede Mr. Booker's death is "sufficiently serious" to satisfy the Due Process Clause's objective component, Aplt. Br. at 57, they contend the Plaintiffs failed to put forth sufficient evidence that the three-minute delay in seeking medical attention *caused* Mr. Booker's death. We disagree.

Plaintiffs' experts provided sufficient evidence for a jury to conclude that the Defendants' delay in seeking medical care contributed to Mr. Booker's death, which is "without doubt, sufficiently serious to meet the objective component necessary to implicate the Fourteenth Amendment." *Martinez*, 563 F.3d at 1088-89 (quotations omitted). Jackie Clark, one of Plaintiffs' experts on the standard of care for nurses,

-47-

opined that the "failure to provide timely medical assessment and resuscitative effort . . . may well have contributed to Mr. Booker's death." Appx. at 834; *see also id.* at 994-95. Another expert, Dr. Steven B. Bird, concluded that "[h]ad the medical staff at the DDC . . . promptly recognized that [Mr. Booker] was in extremis, resuscitation could possibly have saved Mr. Booker's life." Appx. at 725; *see also id.* at 993-94. In light of this evidence, a reasonable jury could conclude the Plaintiffs established the objective component of a failure to provide medical care claim.

ii. Subjective component (deliberate indifference)

The Defendants argue that because they did not check Mr. Booker's vital signs immediately after placing him in the holding cell, they could not, as a matter of law, have had the subjective knowledge to support a finding of deliberate indifference. We disagree.

"[T]he symptoms displayed by [Mr. Booker] are relevant to the subjective component of deliberate indifference. The question is: 'were the symptoms displayed by [Mr. Booker] such that [the Defendants] knew the risk to [Mr. Booker] and chose (recklessly) to disregard it.'" *Martinez*, 563 F.3d at 1089 (quoting *Mata*, 427 F.3d at 753). The disputed facts regarding Mr. Booker's condition after the use of force ended preclude summary judgment. The video evidence suggests Mr. Booker was limp and unconscious when the Defendants carried him to the holding cell. Deposition testimony from the Defendants, on the other hand, varies considerably and suggests that Mr. Booker was still struggling after they carried him into the holding cell. Deputy Gomez, for

example, testified that Mr. Booker reached up and attempted to grab Sergeant Rodriguez while he was in the cell. On interlocutory review of the denial of summary judgment, we must resolve this conflicting evidence in favor of the Plaintiffs.

The Defendants had a front-row seat to Mr. Booker's rapid deterioration. Unlike many deliberate indifference cases, here the Defendants actively participated in producing Mr. Booker's serious condition through their use of force against him, which included a carotid neck hold, considerable weight on his back, and a taser. Given their training, the Defendants were in a position to know of a substantial risk to Mr. Booker's health and safety. *See Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) ("[T]he reasonableness of an officer's actions must be assessed in light of the officer's training."). Each of the Defendants received regular training in "first aid/CPR" and "training that any inmate involved in a use of force incident needs to be medically evaluated after the incident." Appx. at 327. They also received specific training on the carotid restraint about "the risks associated with the restraint as well as steps that must be followed should the inmate become unconscious (such as checking for breath and vital signs)." *Id.*; *see also id.* at 547, 812 (instructing officers to "[c]heck vital signs . . . [n]otify EMS and begin CPR if needed" when a subject "is rendered unconscious" by the carotid restraint). Moreover, each of the Defendants received taser training and certification. *See* Appx. at 338-40.

In light of this training and Mr. Booker's limp appearance, a reasonable jury could conclude the Defendants inferred that Mr. Booker was unconscious and needed

-49-

immediate medical attention.  If a jury concludes the Defendants made this inference, then it could also conclude they were deliberately indifferent in failing to respond sooner. *See Lemire v. California Dep't of Corr. and Rehabilitation*, 726 F.3d 1062, 1083 (9th Cir. 2013) ("While the failure to provide CPR to a prisoner in need does not create an automatic basis for liability in all circumstances, a trier of fact could conclude that, looking at the full context of the situation, officers trained to administer CPR who nonetheless did not do so despite an obvious need demonstrated the deliberate indifference required for an Eighth Amendment claim."); *McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) ("An officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is liable under § 1983 for deliberate indifference.").

The Defendants' attempt to avoid liability by conceding they failed to check Mr. Booker's vitals or even look at his face after the incident is therefore misplaced.  *See Mata*, 427 F.3d at 752 ("An official 'would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'") (quoting *Farmer*, 511 U.S. at 843 n.8); *see also Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (denying qualified immunity where "the record evidence would authorize a jury to find that [the prisoner] was unconscious and not breathing while being carried by the [prison guard] Officers from his cell [after being forcibly subdued] to the 4 North corridor and to find that [the prisoner's] condition was known to the Officers.").

-50-

The Defendants' argument that only three minutes elapsed between the end of the use of force and Sergeant Rodriguez's efforts to seek medical assistance is likewise unavailing. Although this fact could support a conclusion that the Defendants were not deliberately indifferent to Mr. Booker's circumstances, it does not establish this fact as a matter of law. We have previously recognized that "[e]ven a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755 (citing *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) (15-minute delay)); *see also Bozeman*, 422 F.3d at 1273 ("A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes."); *McRaven*, 577 F.3d at 983 (8th Cir. 2009) (seven minute delay); *Bradich ex rel. Estate of Bradich v. City of Chicago*, 413 F.3d 688, 691-92 (7th Cir. 2005) (10-minute delay in summoning assistance for inmate who had hanged himself could support finding of deliberate indifference); *Tlamka v. Serrell*, 244 F.3d 628, 633-34 (8th Cir. 2001) (10-minute delay in providing CPR or any other form of assistance to unconscious inmate could support finding of deliberate indifference).

A brief delay in care is particularly problematic when, as here, the Defendants were responsible for placing Mr. Booker in his vulnerable state and engaged in activity (an eight second taser cycle after he had been placed in a carotid neck hold for over two minutes while in a prone position) that could produce foreseeable, rapid, and deadly consequences. *See Estate v. Owensby v. City of Cincinnati*, 414 F.3d 596, 600-01, 603-04 (6th Cir. 2005) (denying qualified immunity where the evidence demonstrated that

-51-

officers, after beating a suspect, locked him in the back of a police cruiser, and observed him in significant physical distress, "yet made no attempt to summon or provide any medical care" until six minutes later, after greeting each other, preparing for their superiors' arrival, and adjusting their uniforms).

Because deliberate indifference is assessed at the time of the alleged omission, the Defendants' eventual provision of medical care does not insulate them from liability. *See Mata*, 427 F.3d at 756 ("[A]ny assessment of Ms. Mata's condition conducted several hours after her encounter with Ms. Weldon is irrelevant to whether Ms. Weldon knew of and disregarded an excessive risk to Ms. Mata's safety."); *see also McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs."). Even if it could, the parties dispute the sincerity of Sergeant Rodriguez's attempt to alert the facility's nursing staff of Mr. Booker's condition.[31] For example, one reasonable interpretation of the evidence—one we must accept on review of summary judgment—suggests that when she did notify the nursing staff, she failed to convey a sense of urgency, instead merely complaining that Mr. Booker was "acting like he's unresponsive." Appx. at 761.[32]

In any event, the myriad factual disputes preclude summary judgment on this

---

[31] The Defendants concede Sergeant Rodriguez stopped to return the taser before proceeding to the nursing office.

[32] Indeed, Nurse George stated that based on this information, "she did not feel that Mr. Booker's condition was an emergency." Appx. at 761.

claim because "[t]he factfinder may conclude that [the Defendants] subjectively knew of the substantial risk of harm by circumstantial evidence or 'from the very fact that the risk was obvious.'" *Martinez*, 563 F.3d at 1089 (quoting *Farmer*, 511 U.S. at 842); *see also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317 (10th Cir. 2002) (reversing grant of summary judgment because factual disputes remained and "our task is not to decide whether [the defendant] was indeed ignorant to [the plaintiff's] apparent pleas for assistance").

b. *Mr. Booker's right to timely medical care was clearly established.*

The Defendants argue the law regarding Mr. Booker's right to timely medical care was not clearly established at the time of their conduct. We disagree.

We have previously observed "there is little doubt that deliberate indifference to an inmate's serious medical need [violates] a clearly established constitutional right." *Mata*, 427 F.3d at 749. This principle also clearly "applies to pretrial detainees through the due process clause of the Fourteenth Amendment." *Howard v. Dickerson*, 34 F.3d 978, 980 (10th Cir. 1994) (citing *Garcia*, 768 F.2d at 307); *see also Olsen*, 312 F.3d at 1315 ("The right to custodial medical care is clearly established."); *Martin v. Bd. of Cnty. Comm'rs of Cnty. of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990) (upholding denial of qualified immunity on plaintiff's failure to provide medical care claim because *Garcia* "clearly established" that pretrial detainees receive the same protection under the Fourteenth Amendment as convicted inmates under the Eighth Amendment).

The Defendants argue preexisting authority did not give them adequate notice that

they could be deliberately indifferent by failing to summon medical care within a three-minute period. We disagree. The law can be clearly established even when "the very action in question" has not "previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). As long as the unlawfulness of the Defendants' actions was "apparent" "in light of pre-existing law," then qualified immunity is inappropriate. *Id.* (quoting *Anderson*, 483 U.S. at 640); *see also Weigel v. Broad*, 544 F.3d 1143, 1154-55 (10th Cir. 2008) (citing *Hope* with approval and denying qualified immunity on excessive force claim).

Here, the contours of the right are clearly established such that any reasonable officer in the Defendants' position (and with their training) would have known that failing to check Mr. Booker's vital signs, perform CPR, or seek medical care for three minutes when he was limp and unconscious as a result of the Defendants' use of force could violate the Constitution. *See Estate of Owensby*, 414 F.3d at 603 (arresting officers' six-minute delay in seeking medical care for arrestee who died of asphyxiation could evince deliberate indifference); *see also McRaven*, 577 F.3d at 983 (denying qualified immunity where officer "made no attempt to resuscitate" the prisoner "for seven minutes before paramedics arrive[d]"); *Bozeman*, 422 F.3d at 1273 ("We also conclude that the Officers, who knew [the prisoner] was unconscious and not breathing and who then failed for fourteen minutes to check [his] condition, call for medical assistance, administer CPR or do anything else to help, disregarded the risk facing [him] in a way that exceeded gross negligence."); *Tlamka*, 244 F.3d at 633 ("Based on the obvious and

-54-

serious nature of [the prisoner's] condition, the corrections officers' alleged failure to even approach Tlamka during the maximum 10-minute period would rise to a showing of deliberate indifference.").

In light of the foregoing, any reasonable officer in the Defendants' position—having rendered Mr. Booker unconscious by use of force with at least a two-minute carotid neck hold, roughly 140 pounds of pressure on his back, and an eight-second taser stun—should have known that failing to check Mr. Booker's vitals or seek immediate medical attention could evince deliberate indifference to a serious medical need. Accordingly, the conduct alleged by the Plaintiffs—if proven at trial and accepted by the jury—violated clearly established law.

\*      \*      \*

In sum, we conclude the Defendants[33] are not entitled to qualified immunity on Plaintiffs' claim for failure to provide medical care. Where, as here, "disputed material facts implicate [both] of the two questions of whether a serious medical need existed [and] whether an officer was deliberately indifferent to it, a court may not grant summary judgment." *Olsen*, 312 F.3d at 1315-16. We therefore affirm the district court's denial of summary judgment on this claim.

To be clear, our decision is based on what a reasonable jury *could* find, not what a

---

[33] Because each of the Defendants participated in the use of force and had the opportunity to observe Mr. Booker's condition immediately thereafter, *see supra* Part III.B.2, we affirm the district court's denial of summary judgment with respect to all Defendants.

reasonable jury *will* find.  As the district court found, this case is rife with disputed fact

issues—many of which surround the Plaintiffs' claim for failure to provide medical care.

For this reason, this issue is appropriate for trial, not summary judgment.

### E. *Sergeant Rodriguez Is Not Entitled to Qualified Immunity on Plaintiffs' Supervisory Liability Claim.*

The Defendants contend Sergeant Rodriguez is entitled to qualified immunity on

the Plaintiffs' claim for supervisory liability because she lacked the requisite mental

culpability and the law was not clearly established.  We disagree.

1. **Legal Standard**

"A § 1983 defendant sued in an individual capacity may be subject to personal

liability and/or supervisory liability."  *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir.

2011).  Section 1983, however, "does not authorize liability under a theory of respondeat

superior."  *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th

Cir. 2013) (quoting *Brown*, 662 F.3d at 1164); *see also Ashcroft v. Iqbal*, 556 U.S. 662,

677 (2009) ("Absent vicarious liability, each Government official, his or her title

notwithstanding, is only liable for his or her own misconduct.").

"The plaintiff therefore must show an 'affirmative link' between the supervisor

and the constitutional violation."  *Schneider*, 717 F.3d at 767 (citing *Dodds v.

Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)).  This requires "more than a

supervisor's mere knowledge of his subordinate's conduct."  *Id.* (quotations omitted).

Rather, a plaintiff must satisfy "three elements . . . to establish a successful § 1983 claim

-56-

against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind." *Id.*; *see also Dodds*, 614 F.3d at 1195.

The contours of the first requirement for supervisory liability are still somewhat unclear after *Iqbal*, which "articulated a stricter liability standard for . . . personal involvement." *Schneider*, 717 F.3d at 768. We need not define those contours here because, even if "direct participation" is not "necessary" to satisfy this element, *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013), surely it is sufficient.

The second element "requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation" by setting "in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Schneider*, 717 F.3d at 768 (quotations omitted); *see also* Martin A. Schwartz, *Section 1983 Litig. Claims & Defenses*, § 7.19[D] (2014) (supervisory liability standards "only survive *Iqbal* to the extent that they authorize § 1983 liability against a supervisory official on the basis of the supervisor's own unconstitutional conduct, or at least, conduct that set the unconstitutional wheels in motion").

The third element "requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind," *Schneider*, 717 F.3d at 769, which "can be no less than the *mens rea* required" of the subordinates to commit the underlying constitutional violation, *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).

2. **Analysis**

-57-

To establish supervisory liability, the Plaintiffs must show Sergeant Rodriguez's (1) personal involvement, (2) causation, and (3) the requisite state of mind with respect to either the excessive force or failure to provide medical care claims. *See Schneider*, 717 F.3d at 767.

Our earlier conclusions that a reasonable jury could find Sergeant Rodriguez actively participated in—and failed to intervene and prevent—the use of excessive force (*see supra* at Parts III.B.2 & III.C.2.a.i.2),[34] satisfies the first and second elements. Similarly, our earlier conclusion that a reasonable jury could find Sergeant Rodriguez exhibited excessive zeal—by using the taser on Mr. Booker for 60 percent longer than the recommended time period when he was no longer resisting and fully subdued by handcuffs, Deputy Robinette's weight, and Deputy Grimes's carotid neck hold, *see supra* Part III.C.2.a.i—satisfies the third element. Finally, our conclusion regarding clearly established law, *see supra* Part III.C.2.b, also precludes summary judgment on this claim. *See* Schwartz, § 7.19[E] ("Under the holding in *Iqbal* that a supervisory official may be held liable under § 1983 only for his or her unconstitutional conduct, there is no longer

---

[34] Although we focus on excessive force here, Sergeant Rodriguez could also be held liable in her capacity as a supervisor on the Plaintiffs' claim for failure to provide medical care because (1) both she and her subordinates failed to provide medical care after using deadly force against Mr. Booker, which a reasonable jury could find (2) deprived Mr. Booker of a constitutional right, and (3) displayed deliberate indifference to Mr. Booker's medical needs by failing to convey the critical nature of his condition to the medical staff. Thus, for the same reasons discussed above in our consideration of the Plaintiffs' claim for failure to provide medical care, *see supra* Part III.D.2, we hold that Sergeant Rodriguez is not entitled to summary judgment on Plaintiffs' supervisory liability claim.

any need to contemplate whether qualified immunity as applied to supervisory officials requires special or separate consideration.").

Accordingly, we hold that Sergeant Rodriguez is not entitled to qualified immunity on the Plaintiffs' claim for supervisory liability.

## IV. **CONCLUSION**

For the foregoing reasons, we affirm the district court's denial of qualified immunity on the Plaintiffs' excessive force, failure to provide medical care, and supervisory liability claims. We deny the Defendants' motion to seal portions of the appendix.[35]

---

[35] The Defendants moved to file portions of the appendix under seal. The Clerk of this Court provisionally granted the Defendants' motion, with a final decision to be made by this panel. We now deny that motion.

Judicial records are presumptively open to the public. *See Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241 (10th Cir. 2012) ("Courts have long recognized a common-law right of access to judicial records." (quotations omitted)). A party seeking to restrict access must therefore "show 'some significant interest that outweighs the presumption.'" *Id.* (quoting *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007)). This "burden of justifying that secrecy" remains on the party opposed to access even after a court has previously determined that sealing is appropriate. *United States v. Pickard*, 733 F.3d 1297, 1302 (10th Cir. 2013).

The Defendants' only stated reason for filing these documents under seal is that they were submitted under seal to the district court. "This Court, of course, is not bound by the district court's decision to seal certain documents below, and retains its own 'authority to decide whether the parties may file documents under seal in this Court.'" *Colony*, 698 F.3d at 1241 (quoting *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011)). Because the Defendants fail to make any additional showing of "good cause," we deny their motion to file these portions of the appendix under seal.